IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| WILMA STAMM, | ) | C.A. No. 3:06-3559-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | **GRANTING MOTION FOR** |
| KONICA MINOLTA BUSINESS | ) | **SUMMARY JUDGMENT** |
| SOLUTIONS U.S.A, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Through this action, Plaintiff, Wilma Stamm ("Stamm"), seeks recovery from her former employer, Konica Minolta Business Solutions U.S.A., Inc. ("KMBS"), for alleged age and gender-based discrimination, retaliation and breach of an unspecified contract. Each of these claims arises out of the cessation of Stamm's employment in March 2005 and related events.[1]

The matter is now before the court on KMBS's motion for summary judgment. For the reasons set forth below, the motion is granted in full.[2]

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that

_____

[1] Stamm characterizes the cessation of her employment as a termination. Defendant, KMBS, characterizes it as a resignation.

[2] This matter was initially assigned to a magistrate judge for pretrial proceedings pursuant to Local Civil Rule 73.02(B)(2)(g). The matter became unassigned as a result of the vacancy of one magistrate judge position and division transfer of the previously assigned magistrate judge. To avoid a resulting backlog in cases, the undersigned has elected to withdraw the reference in this matter and resolve the motion without a report and recommendation.

summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

Taken in the light most favorable to Stamm, the non-moving party, the facts are as follows. Stamm was employed by Konica Business Technologies, Inc., a subsidiary of Konica Corporation (collectively "Konica") from mid-1997 through March 2004. Throughout that period, Stamm served as a National Account Manager ("NAM") and reported to Russell Dixon ("Dixon").

In April 2004, Konica merged with Minolta Co., Ltd. ("Minolta") to form KMBS. As of the date of the merger, Stamm became an employee of the merged company, continuing in the role of

a NAM but reporting to a new supervisor, Chris McMillan ("McMillan").   She retained the same

job and supervisor until her employment ended in March 2005.

Prior to the merger, Stamm was meeting the expectations of her employer as evidenced by

positive performance appraisals she received from Dixon.   Although Stamm's job title and general

duties (sales) remained the same after the merger, various aspects of her job changed.   For example,

her territory was substantially reduced in geographic scope.   She was also required to learn new

pricing programs relative to the modified (merged) product line.

As noted above, Stamm also reported to a new supervisor whose team consisted of six

NAMs.   The five NAMs other than Stamm were all male and former Minolta employees.   McMillan

and these five NAMs were all also younger than Stamm (who was then in her early sixties)   although

one of the other NAMs, John Jernigan ("Jernigan"), was also over sixty.

**Alleged Disparate Treatment.**   Beginning shortly after the merger, Stamm began to

experience what she perceived as disparate treatment which she alleges was the result of McMillan's

bias against her due to her age or gender or both.   In her complaint, Stamm identified the events and

circumstances which she believed constituted discrimination as including the following: (1) a

general combativeness and poor working relationship (¶ 8); (2) changes to her territory and

differential treatment relative to male NAMs (¶¶ 11, 13 & 15); (3) the scheduling of a "deep sea

fishing trip for the men" as to which "McMillan told plaintiff she could visit 'a spa'" (¶ 12); (4)

failure to provide Stamm as much support as the male NAMs, particular regarding joint sales calls

on dealers (¶ 14); (5) failure to provide Stamm a company car despite providing the same to male

NAMs (¶ 16); (6) changing dealer assignments based on letters of complaint from dealers without

seeking to resolve the complaints in the manner preferred by Stamm (¶ 17); (7) engaging in a general

"pattern and practice of intimidation, harassment and criticism" of Stamm designed to force her resignation (¶¶ 18 & 19); and (8) terminating Stamm.

During her deposition, Stamm was asked to list all instances of alleged discrimination and to provide details. Her list included claims of differential treatment in territorial assignments; KMBS's failure to provide her with a company car; McMillan's failure to provide her the type of support she believed she needed; and references to the deep sea fishing trip. While Stamm referenced other incidents during her deposition, these are the only circumstances which are both referenced in the deposition and presented in opposition to summary judgment. The evidence relevant to these issues is, therefore, addressed in more detail below.[3]

**Territory Assignments**. As to territory, Stamm complains that one NAM on McMillan's team, Thomas Cutler, was treated more favorably than she was because Cutler was allowed to keep a dealer which he had formerly served (for Minolta) within Stamm's geographic territory.[4] When Stamm learned of this accommodation, she asked to keep one of her old dealers in Cutler's territory. Her request was denied.

Stamm has not, however, proffered evidence that the circumstances of her request were similar to circumstances which led to the change in Cutler's territory. Defendant, in response, has proffered uncontradicted evidence that the circumstances differed because the request which led to

---

[3] Stamm also testified to two isolated comments, one made to Stamm by McMillan (regarding alcohol consumption) and one overheard comment made by an unidentified third-party that may or may not have been referring to Stamm (that the person referred to "did not have Minolta in her name"). These comments are not, however, relied on by Stamm in opposing KMBS's motion and will not be further considered here.

[4] The complaint suggests that multiple male NAMs were given such accommodations. Complaint ¶ 13. The proffered evidence, however, is limited to that addressed above.

modification of Cutler's territory was made by the *dealer* (not the NAM). More critically, that dealer

threatened to cease doing business with KMBS if it did not retain the same NAM. Neither factor

was present as to Stamm's request.[5]

**Company Car.** Stamm's claims of differential treatment regarding a company car are

likewise unsupported. As Stamm conceded, NAMs were allowed either a company car or were

reimbursed for mileage. She received the latter, mileage reimbursement, throughout her tenure with

KMBS.

At some point in the fall following the merger (fall of 2004), Stamm requested a company

car but did not receive one prior to the cessation of her employment in March 2005. Stamm has not

proffered any evidence that any male or younger NAM (either on McMillan's team or any other)

requested a car during a similar time frame and received one any earlier than she did.[6]

**Support.** Stamm's claim that she received less support than her younger male counterparts

rests on her direct knowledge that McMillan only joined her once in the field for dealer visits and

_____

[5] In her deposition, Stamm also suggested that the decision to assign her a territory which was closer to her home and included her home state was discriminatory because Jernigan, who lived in the same state, was given a more distant assignment. Stamm apparently assumed Jernigan was given a choice and selected the distant assignment. She did not, however, provide any direct evidence in support of these assumptions. Neither did she offer any explanation for why Jernigan might have preferred or how he might have been benefitted by the more distant assignment. The court need not consider this counterintuitive claim of discriminatory treatment further as Stamm does not rely on this allegation in her opposition memorandum.

[6] Most or all of the male NAMS on McMillan's team had company cars during the relevant period. This was not, however, the result of disparate treatment by KMBS. Instead, it was the result of Minolta's pre-merger car policy which resulted in these individuals being assigned a car prior to the merger. Stamm's former employer, Konica, did not have a similar car policy. Thus, the difference in treatment as to company cars was merely the result of the merged company's decision to allow individuals who had previously been assigned cars prior to the merger to retain them.

her belief that he visited dealers with his other NAMs more frequently.  The latter point is without clear evidentiary support, nonetheless, the court will assume for present purposes that McMillan spent more time in the field with at least some of his male NAMs then he did with Stamm.[7]  Stamm has not, however, shown that she requested and failed to receive such assistance.  Rather, her testimony was limited to a claim that McMillan was unavailable to accompany her on one or more occasions when she requested he do so, but she conceded that he declined because of other preexisting obligations.   The evidence also establishes that, even if he accompanied some NAMs on dealer visits, he did not accompany all of them.  For example, Jernigan, who was a new NAM, testified that McMillan never accompanied him on a dealer visit during the year following the merger.  Jernigan Dep. at 29-30.

**Fishing Trip**.  The deep sea fishing trip occurred in May 2004 and was planned roughly a year before the merger and, therefore, prior to the time Stamm became a member of McMillan's team.  McMillan Dep. at 91-92.  Contrary to the suggestion in the complaint that she was excluded from participation, Stamm conceded in her deposition that she was invited to join the group.  She also conceded that she did not inform anyone that she preferred not to participate until the morning of the fishing trip.  Her primary concern at that point was that she might become seasick (a gender-neutral malady).

Stamm has offered no evidence that McMillan suggested she go to a spa instead of joining

---

[7]  In her opposition memorandum, Stamm asserts that McMillan spent fifty percent of his time in the field with his other NAMs.  The testimony she cites, however, responds to a question regarding his time in the field *before* the merger.  *See* McMillan Dep. at 19-24.  While McMillan testified that he was available when requested, he also testified that experienced NAMs such as Stamm normally would be self-sufficient, and not need his assistance to call on dealers.  McMillan Dep. at 55.

the rest of the team on the trip (as alleged in the complaint).  In fact, her primary reason for taking offense, as explained in her deposition, was that McMillan did not suggest she do something nice for herself that day since she was not going on the trip.  Stamm Dep. at 119 (indicating that this was the approach Dixon, who she concedes never discriminated against her, had taken in the past under similar circumstances).

**Alleged Injury or Causation**.  In addition to failing to proffer evidence that she was treated differently from the younger male NAMs under similar circumstances, Stamm has failed to proffer evidence that any such difference led or contributed to her resignation or termination.   In other words, she has not shown that the minor difference in her territorial assignment (relative to Cutler), limitation to mileage reimbursement (rather than assignment of a company car); McMillan's failure to join her for more calls on dealers, or her absence from the fishing trip contributed to her inability to satisfy KMBS's expectations or otherwise led to the alleged adverse employment action at issue in this action: her resignation or termination.

**Stamm's Job Performance.**  Within the first few months following the merger, McMillan began to raise concerns regarding Stamm's job performance.  These concerns related, *inter alia*, to Stamm's failure to (1) prepare sales forecasts and business plan documents in the manner requested by McMillan, (2) learn the new pricing programs and gain proficiency in the various computer programs used by NAMs, and (3) respond to requests and  inquiries from McMillan and others on a timely basis.  These concerns were expressed, *inter alia*, in numerous e-mails which Stamm concedes she received.[8]

---

[8]  These e-mails are included in the following exhibits to Stamm's deposition: Ex. 6 (8/13/04 e-mail regarding "Rules of Engagement" with dealers and indicating that this information had been provided to Stamm previously); Ex. 7 (8/16/04 stating that McMillan was "getting a lot of heat from

While Stamm contends that McMillan's view of her performance was unfair and speculates that his reasons were based on age or gender bias, she has presented no evidence that he did not, in fact, hold the view that she was not performing her job adequately in the manner addressed in his e-mails and other communications.  Stamm has also conceded a number of the underlying facts: that she did have difficulty learning the new pricing programs, using various computer programs, and

---

Corp. that you don't reply to e-mails," advising Stamm that she must reply to all e-mails promptly, and suggesting that Stamm obtain training on various computer programs used in her job); Ex. 8 (9/2/04 e-mail asking Stamm to advise McMillan by September 15 of the dates of her scheduled computer training and later e-mail in same string (date line missing) complaining that Stamm had not responded  by September 15th); Ex. 9 (9/2/04 e-mail indicating McMillan had not received Stamm's 30/60/90 day forecast and asking if it might have been sent to someone else); Ex. 10 (later e-mail on 9/2/04 stating "Where is your forecast?????  We discussed this yesterday, we discussed this earlier today.  I have sent to you for the last two months the dates these reports or due.  You seem to have a problem with this report. . . . I cannot have you turning in your report late month after month."); Ex. 23 (10/26/08 e-mail reminding Stamm to contact McMillan and Ed Williams at least every other day); Ex. 18 (11/15/04 e-mail addressing two dealer complaints and related reassignment to a different NAM and reminding Stamm of two reports requested to address concerns with her performance); Ex. 19 (11/16/04 9:21 a.m. e-mail questioning why Stamm has not responded to her voice mail and why she was in Mobile, Alabama – also noting she had called on another dealer outside of her territory two weeks earlier after which she was "again [given] the list of [her] dealers so [she] could have it handy" in case she could not locate the original list "used to configure [her] territory many months ago"); Ex. 21 (11/16/04 2:10 p.m. e-mail  repeating concerns regarding why Stamm was in Mobile and not responding to repeated calls);  Exs. 27 & 28 (11/17/04 e-mail string with first referencing an earlier telephone conversation, confirming that Stamm should send her business plan, and raising various concerns with Stamm's performance and later response commenting on inadequacies with Stamm's business plan, as well as her response to the complaint that dealers were not utilizing her because of her perceived deficiencies and request for more specific guidance on job duties ); Ex. 29 (11/18/04 e-mail complaining that Stamm was not returning voice mails and addressing the need to clear her messages on her cell phone); Ex. 35 (12/16/04 e-mail asking for a "pipeline report" and describing necessary content); Ex. 36 (1/7/05 e-mail suggesting both that Stamm not "broadcast" to dealers that she will be calling on their competitors and that she limit her in-person visits to high-volume dealers); Exs. 39 & 40 (2/22/05 e-mail complaining that Stamm had not provided her pipeline report when requested and that the report which was provided did not contain "that much information"); Ex. 41 (2/23/05 lengthy e-mail addressing various concerns with Stamm's performance to date and ability to meet the company's future requirements and indicating that McMillan wanted to meet with Stamm the following week to discuss Stamm's role and future with the company).

meeting McMillan's requirements for sales reports and forecasts. She has presented no evidence that any of McMillan's complaints were unfounded, although she offers mitigating explanations for some of her alleged deficiencies. *See, e.g., infra* Dealer Complaints and Territorial Incursions.

Stamm also characterizes the culture and attitude of the company after the merger (as she experienced as a member of McMillan's team) as being different from her pre-merger experience. For example, she noted during her deposition that she experienced less support and flexibility after the merger than before. Stamm has not, however, offered any evidence that she was treated differently with respect to this culture than her fellow NAMs.[9]

**Dealer Complaints and Territorial Incursions.** McMillan's dissatisfaction with Stamm's performance increased in the fall following the merger after he received complaints regarding her performance from two dealers as well as reports that Stamm had visited two different dealers who were outside of her territory. While Stamm disagrees with the manner in which McMillan handled the customer complaints and reports that she met with dealers outside of her territory, she does not challenge the claim that McMillan did, in fact, receive such complaints[10] and that she did, in fact, call on dealers outside of her territory.[11] Stamm has presented no evidence that McMillan ever

---

[9] Although she alleges that she was not provided needed support, Stamm concedes that McMillan asked her to take certain computer courses at company expense to help her meet his expectations. Stamm apparently completed at least one of the suggested courses. She has not, however, provided evidence that she responded to McMillan's request that she provide proof of successful completion of this or any other course.

[10] *See* Stamm Dep. Ex. 14 (11/4/04 letter from Kathryn Murph complaining not only that Stamm dropped in when asked not to, but also that she lacked expertise and failed to provide needed assistance); Stamm Dep. Ex. 12 (9/29/04 e-mail from Lindsay Hulett complaining that Stamm failed to provide supplies needed for a new installation and failed to replace those supplies for at least a month after promising to do so).

[11] In her deposition, Stamm explained that she called on one of the two dealers who was not assigned to her for two reasons. First, she claims that she misunderstood the physical limits of her

received similar complaints regarding other NAMs, much less that he treated male or younger NAMs differently in the face of similar complaints.

**Sales Quota.** During her year as a KMBS NAM, Stamm met one of her two quota requirements but failed to meet the other, resulting in an overall performance of only 77% of her total revenue goal. Every other NAM who reported to McMillan met 100% of the combined goal.

In arguing that she was treated differently as to quota, Stamm directs the court to evidence that other KMBS sales persons who did not report to McMillan had revenue performance similar to Stamm's and were not terminated. These individuals are not, however, similarly situated in that none reported to McMillan and a number were not even NAMs. There is, likewise, no evidence that any of these individuals were suffering performance deficiencies similar to Stamm, had received similar complaints from dealers, or had made other errors similar to Stamm's repeated territorial incursions.[12]

**Resignation or Termination.** In early March 2005, just prior to KMBS's new fiscal year, McMillan asked Stamm to come to New Jersey for a meeting. At that meeting, which was held on March 9, 2005, McMillan and Donald Warwick ("Warwick"), KMBS's Vice President of Human Resources, presented Stamm with a letter which provided her two choices: remain employed but

---

territory, believing it to include all of Alabama rather than just northern Alabama despite having recently been given a list of all of her dealers (after making a similar error only two weeks before). Second, she claims that the out-of-territory dealer's relationship with another dealer who was within her territory justified the call, even though she was told that all decisions were made by the dealer who was within her territory. Neither explanation is so compelling as to require an employer to accept it as justification for Stamm's error, particularly given that it was the second similar error in a short period of time. At the least, it would have been reasonable to expect Stamm to call for clarification before traveling over 800 miles to meet with a dealer who might be assigned to another NAM.

[12] The contemporaneous documentary evidence as well as testimony indicates that quota was only one of the concerns leading KMBS to offer Stamm the choice which led to her resignation (or termination).

subject to a final warning which would result in termination if Stamm did not improve her performance to KMBS's satisfaction, or resign and be eligible for a severance package.

The first paragraph of this letter states that McMillan has serious concerns as to whether Stamm has the skill set necessary to be successful in [her] position." It acknowledges, nonetheless, that Stamm has "been adamant that [her] performance has been satisfactory and that [she does] add the needed value to [her] dealers to effectively support their business efforts." Stamm Dep. Ex. 47. The letter then states:

> Based on the above, we are making you the following offer:
>
> 1.    (a) You are being placed on Final Performance Warning.
>
> (b) Provided you take immediate corrective actions to meet the expectations of your position and continually demonstrate that you are a positive force in motivating, training and developing your dealers going forward, you will remain as an employee of Konica Minolta and continue in the position of Dealer National Account Manager . . . .
>
> [(c) Salary and other compensation will remain unchanged.]
>
> (d) All Special Termination Benefits . . . under Option 2 of this letter will become null and void and will not be offered again in the future, should termination of your employment due to unsatisfactory performance become necessary.
>
> (e) You will be given until 9:00 a.m. (EST) Monday, March 14, 2005 to advise us, in writing, of your decision with regards to the above.
>
> 2.    If you do not choose to remain with the Company . . . as an alternative, Konica Minolta has offered you the following Special Termination Package which consists of [agreement that separation was Resignation by Mutual Agreement with Stamm to be paid all vacation then due plus sixteen weeks of base salary, a limited continuation of benefits, outplacement services, and an agreement not to oppose unemployment.]
>
> (g) RELEASE OF CLAIMS.  In exchange for the benefits set forth above, Konica Minolta will require a Release of any and all claims against Konica Minolta.

We recommend that you take this letter and the enclosed Severance Agreement and General Release with you and consider fully your options. You may, of course, seek Legal counsel before coming to a decision. You will be given a minimum of twenty-one (21) days to review and consider the Special Termination Package which has been offered to you. We will require that you make a decision with regard to the choice set forth under Option 1 above no later than March 14, 1005; however, you will be given until March 31, 2005 to notify us, in writing with regard to Option 2 above. Within seven (7) days of your execution of the Release, you may revoke this decision by written notice to Konica Minolta.

Stamm Dep. Ex. 47.[13]

Stamm requested and was granted an additional day to decide how to respond to the letter. Her responsive letter began with a conditional agreement to resign. Stamm Dep. Ex. 52 ("In response to your March 9, 2005 request for my resignation, assuming we clearly resolve the following issues, I concur."). The conditions included requested modifications to the Special Termination Package. In addition, Stamm indicated that she had consulted counsel and understood she should be given twenty-one days to make her decision on *both* options.

Warwick responded on behalf of KMBS, explaining that the dual time frames were consistent with legal requirements (the twenty-one day period only being required for release of certain federal rights) and noting that Stamm had not met the deadline for indicating if she elected to remain employed under the first option. Nonetheless, he extended that deadline until later the same day "to tell us in writing whether or not you intend to remain in your position, consistent with Option 1[.]" Warwick further stated: "If I do not receive a definitive response from you with respect

---

[13] Stamm testified that she was shaken by the meeting and did not understand much of what was said. She did, however, receive a copy of the letter. Despite having the letter in her possession and time to confer with others, including counsel, regarding its meaning, she mischaracterizes the letter as offering only a choice between resignation and termination. This characterization of the letter is contrary to its plain language and is not, therefore a reasonable inference. In any event, Stamm's subsequent communications challenging certain aspects of the alternative offers show that she was able to read and understand the details of what was offered.

to this decision by this deadline, we will assume you are remaining in your position and our offer of a special severance program will be forever rescinded." Stamm Dep. Ex. 53  The letter then addressed each of Stamm's requested modifications or clarifications.

This letter was sent to Stamm as an attachment to an e-mail which reflects transmission on March 15, 2004 at 12:56 p.m.  Stamm responded a little over an hour later stating: "I'm advised that clarifications in your 3-15-05, 12:56 PM letter be incorporated into the severence [sic] agreement or your letter should be designated an adendum [sic] to the same agreement." Stamm Dep. Ex 53. Warwick responded shortly thereafter stating: "Wilma, For the last time, if I do not receive a clear and definitive answer to my question with respect to whether or not you intend to keep your position there will be no severance offer." *Id.*

Several hours later, Stamm sent a facsimile transmission to Warwick.  The cover page has a handwritten note stating "I just read a[n] e-mail from Chris stating a signed copy of my 1st letter was needed.  SECOND IS INCLUDED – WS."  The third page of the transmission consists of a one page letter to Warwick stating "In response to Mr. Chris McMillan's March 9, 2005 request for my resignation, I concur."  Stamm Dep. Ex. 58.  In her deposition, Stamm conceded that this letter bears her signature.  While she claimed not to have intended the letter as a resignation, she was unable to recall or explain what it was to which she was concurring.  Stamm Dep. at 312-13 (stating "I don't recall what I concurred to, but it was not a resignation." ).  There is no evidence that Stamm took any other action which would have clarified her intent (assuming she did not intend to resign). For example, there is no evidence that she continued (or attempted to continue) to perform her duties as a NAM for KMBS.

**Reassignment of Territory.** Following the conclusion of Stamm's employment, her territory was divided up among three of the other NAMs who worked for McMillan. No new NAM was hired to replace Stamm.

## DISCUSSION

### I.    Retaliation Claim

In her responsive memorandum, Stamm concedes that she cannot succeed on her retaliation claim. The court, therefore, grants the motion for summary judgment with respect to this claim.

### II.    Contract Claim

In her complaint, Stamm asserts a single claim for breach of contract and violation of the duty of good faith and fair dealing. The contract at issue is not identified. Given the remaining allegations of the complaint, the contract at issue is presumed to be the "contract" of employment.

Stamm's Local Civil Rule 26.03 responses (included with the Joint Fed. R. Civ. P. 26(f) Report), appear to provide some clarification of her contract claim through the listing of supporting case law. The three cases listed in support of the contract claim all involve claims that an employee's at-will employment status was modified by terms set out in an employee handbook. Thus, as clarified by her Local Civil Rule 26.03 responses, Stamm's contract claim would appear to be a claim that her at-will employment status was modified by an employee handbook (most likely as to a progressive disciplinary plan).

Stamm did not, however, identify an employee handbook in response to an interrogatory asking her to identify any written contract on which she was relying for her contract-based claim. Indeed, she declined to identify any written contract, responding "none" to the relevant inquiry. By doing so, she precluded reliance on any written document as part of her contract claim.

14

Given all of the above circumstances, one might reasonably assume that Stamm had abandoned her contract claim. This is not, however, the case.

In response to summary judgment, Stamm argues that her contract claim is based on three separate "contracts." First, she argues that her claim is based on a Severance Plan dated March 31, 2004. Second, she argues it is based on KMBS's failure to reimburse her for expenses incurred during the last few months of her employment. Third, she argues that it is based on KMBS's failure to reimburse her for computer expenses after her employment ended.

Nothing in the complaint or any other document available to the court predicts any of these three bases for the contract claim. At most, Stamm makes some mention of the expense and computer issues in her deposition. Thus, absent some document indicating that KMBS was given fair notice that Stamm intended to seek recovery for breach of the three now-asserted "contracts," the court will not allow Stamm to amend her claims in this manner after KMBS has filed its motion for summary judgment.

Stamm's contract claim(s) as now presented are also precluded by Stamm's interrogatory response ("None") to the extent they rely in whole or in part on a written document as forming the contract. The Severance Plan would clearly fall within this ruling. Her claim for reimbursement of expenses (including computer expenses post-employment) may not be based on a similar "plan" or written contract, but would require her to have submitted a proper claim. Thus, the expense claim documents should have been identified in response to the interrogatory if Stamm intended to rely on non-payment of expenses (including relating to the computer) as the basis of her contract claim in this action.[14]

---

[14] Had the expense and computer issue been properly identified as the basis for the contract claim, these issues might have been properly developed during discovery and briefed on summary judgment. As it is, they are only addressed in Plaintiff's response and Defendant's reply, with the latter noting the surprise nature of this characterization of the claim.

There are multiple additional difficulties with Stamm's attempt to rely on the Severance Plan. First, this is obviously an ERISA Plan, which would be subject to a claim under 29 U.S.C. § 1132, not under the common law of contracts. Before proceeding in federal court on such a claim, Stamm would need to make a timely claim and exhaust plan remedies if the claim was denied. Second, the limited circumstances under which the Severance Plan grants benefits would not be triggered by the circumstances of Stamm's resignation (even if characterized as a termination). Third, the Severance Plan (like the Special Termination Package offered Stamm) requires execution of a release. There is no indication that Stamm offered or sought to execute a release under this Plan.[15]

For all of the above reasons, the court concludes that Stamm has failed to establish that any contract claim she now advances was adequately predicted by the complaint. The court further concludes that Stamm has failed to proffer any evidence to support the only contract claim which is adequately predicted by the complaint and related documents (*i.e.,* a claim for violation of the terms of a handbook). Defendant KMBS is, therefore, entitled to summary judgment on this claim.

## III.    Title VII and Age Discrimination Claims

Stamm alleges that she was terminated due to her gender (in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*) and her age (in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* As to both, Stamm proceeds under the indirect proof, burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 301, 312-13

---

[15]    Stamm rather confuses the rights which employees have under the Severance Plan with the Special Termination Package she was offered in the March 9, 2005 letter. The Severance Plan is an Employee Benefit Plan governed by ERISA which provides benefits under limited circumstances which do not include the circumstances of Stamm's resignation/termination. The Special Termination Package offered to Stamm, in contrast, would be contractual in nature because it is not part of a "Plan."

(discussing burden shifting framework in age discrimination case).

To satisfy this proof scheme Plaintiff must establish the following four elements: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing at a level that met her employer's legitimate job expectations at the time of the adverse employment action; and (4) she was replaced by someone outside her protected class with comparable qualifications or the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Causey v. Balog*, 162 F.3d 795, 802 & n.3 (4th Cir. 1998) (elements in an age discrimination claim); *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995) (elements in gender discrimination claim).[16]

**Membership in Protected Class.** The first element is not in dispute. Stamm is a member of two protected classes because she is female and over the age of forty.

**Adverse Employment Action.** Stamm's employment ended as a consequence of her response to the March 9, 2005 letter. That letter offered Stamm a choice between continuing her employment under conditions which she might reasonably have assumed had a high probability of leading to her ultimate termination at some point in the relatively near future, and resigning with the option of signing a release and receiving the benefits of a Special Termination Package. Stamm took six days to consider her options, during which time she had the opportunity to consult counsel and apparently did so. She then responded by e-mail seeking modifications of the terms of the

---

[16] Stamm argues that it is undisputed that she was a member of a protected class; that she was performing at a level that met or exceeded her employer's expectations, that she was terminated, and that her position was filled by someone outside the protected class. Dkt. No. 52 at 7. Given that Stamm is opposing summary judgment, she need not establish that these facts are undisputed, she need only establish that there are genuine issues of material fact. For reasons which follow, the court concludes that she has failed to establish that such an issue exists as to the second through fourth factors.

17

Special Termination Package and additional time in which to decide *which option to select*.

This garnered a response from Warwick which reiterated that Stamm must decide between continued employment (under a final warning) and resignation. As he repeated in that letter (forwarded by e-mail), the decision whether to remain employed or resign was then due. The decision whether to accept the Special Termination Package (giving a release in exchange for severance pay and other benefits) was subject to a later deadline consistent with requirements of federal law.

Later the same day, Stamm communicated her decision in a faxed, signed letter in which she stated: ""In response to Mr. Chris McMillan's March 9, 2005 request for my resignation, I concur." Although Stamm asserted in her deposition that she did not intend, by this letter, to concur with her own resignation, that intent is contrary to the letter's plain language. Moreover, Stamm has offered no evidence that she provided any other communication or took any other action inconsistent with the obvious meaning of her one-line letter. Under these circumstances, no reasonable jury could find that Stamm did not resign.[17] At most, they might conclude that she was forced to make a Hobson's choice between continued employment in the short term with later termination likely and immediate resignation.[18] Regardless of the motivation for the resignation, the fact that Stamm

---

[17] Even if the responsive letter was not enough to establish Stamm's resignation as a matter of law, that letter combined with the absence of evidence that she attempted, thereafter, to return to work requires the conclusion that she did, in fact, resign.

[18] While Stamm claims to have believed the choice was purely between termination and resignation, this characterization is contrary to the plain language of the March 9, 2005, letter which sets out her options in detail. It is also contrary to Stamm's e-mails which sought additional time to choose between the two options. In any event, Stamm has offered no evidence that she was told anything different than was stated in the letter. Her testimony regarding the meeting in which the letter was presented indicates only that she was so shocked that she failed to comprehend what she was told.

18

resigned (rather than being terminated, at least where termination was not the inevitable result) precludes her from establishing the second element of her prima facie case: that she suffered an adverse employment action.

**Meeting Employer's Legitimate Expectations.**  The third element presents another substantial hurdle for Stamm.  Uncontradicted documentary evidence shows that McMillan began expressing his dissatisfaction with Stamm's performance no later than August 2004.  His initial concerns included the following: (1) Stamm failed to timely respond to e-mails and voice mails; (2) Stamm did not file required reports on a timely basis or in the required form; (3) Stamm had deficiencies in her computer skills (which apparently contributed to the first two difficulties) which she failed to correct; and (4) Stamm failed to understand instructions such as the "Rules of Engagement," even when provided in written form.  As the year progressed, additional concerns were added.  These concerns resulted from (1) Stamm's failure either to comprehend or honor the limits of her territory; (2)  customer complaints regarding Stamm's skills and actions; and (3) Stamm's failure to satisfy her full quota, falling far behind any other NAM on McMillan's team.

While Stamm takes issue with some of McMillan's requirements and questions the reasonableness of his expectations and his responses to problems, she has not proffered any evidence that the particular matters about which he complained in his e-mails were untrue.  For example, she has offered no evidence that she had timely returned calls and e-mails and filed reports at times when he asserts she had not done so.  Neither has she proffered evidence that she did not need additional computer training or, alternatively, that she completed the required computer courses and provided the requested proof of completion to McMillan.  There is, likewise, no evidence that the two written customer complaints which McMillan received were not what they purport to be–unsolicited complaints about Stamm's actions and abilities–or that his assertions as

19

to her failure to fulfill her quota were untrue. Finally, while Stamm offers explanations for one of her two incursions into another NAM's territory, she does not deny that she twice ventured far beyond her assigned area, the second offense occurring within a few weeks of the first, and after McMillan had reminded her of her territorial limits by providing *another* copy of her list of assigned dealers and their locations.[19]            What evidence Stamm proffers in support of her claim that she was meeting her employer's legitimate expectations consists primarily of multiple performance appraisals she received prior to the merger. *See* Dkt. No. 52 at 7-9. While these appraisals may be indicative of Stamm's performance at an earlier time of a similar job for a different supervisor and company, they are not evidence of her actual performance of the job she held after the merger which required her to meet the expectations of a different supervisor selling additional products for a different (newly formed merged) company.

Stamm also relies on a single statement from Warwick's deposition where she contends he "all but admitted Stamm was meeting the defendant's expectations at the time of her termination." Dkt. No. 52 at 10. In the referenced statement, Warwick indicates that he believed that Stamm may have met her quota during her "first year." Not only does this argument incorrectly suggest that the concerns with Stamm's performance were limited to quota – they clearly were not – but it ignores the undisputed evidence that Stamm did not, in fact, meet her quota for the only full fiscal year during which she worked for KMBS.

In short, Stamm has failed to proffer evidence which would raise a genuine issue of material fact as to the factual basis for KMBS's claim that Stamm was not meeting its expectations of her as a NAM. The question, therefore, becomes whether those expectations were reasonable.

---

[19]  Even if accepted as true, Stamm's explanation for the second improper call as stated in her deposition would raise legitimate concerns for an employer because it suggests that she is either unable or unwilling to understand the limits of her territory or to seek guidance when the territorial limits are in doubt.

As to this point, Stamm offers her personal view that McMillan's requirements may, in some respects, have been unreasonable, amounting to micro management. Alternatively, she suggests that McMillan contributed to her failure by failing to provide adequate support in the form of assistance in the field. She does not, however, challenge the evidence which establishes that McMillan provided substantial guidance through e-mails, phone calls, and forwarded instructions (*e.g.,* the Rules of Engagement) to assist her. She has offered nothing beyond her own subjective opinion that McMillan's expectations and requirements were unreasonable. This is simply not enough.

In any event, there is no evidence that McMillan's expectations (including requirements such as timely return of phone calls and e-mails as well as filing of reports and meeting quota) were unreasonable expectations of someone in Stamm's position, a high level sales representative with a far flung territory. Neither is there any evidence that Stamm was subjected to different requirements and expectations than similarly situated younger male counterparts who reported to McMillan and who, notably, all met their goals and as to whom there is no evidence of dealer complaints.[20]

Stamm has, therefore, failed to proffer evidence either that she was meeting McMillan's and KMBS's expectations or that those expectations were not legitimate expectations of an employee in her position. She cannot, therefore, establish the third prong of her *prima facie* case.

**Replacement by Someone Outside the Protected Class or Other Circumstances Suggesting Discrimination.** Stamm's territory was redistributed between existing NAMs. No one

---

[20] For these purposes, the court assumes that at some point during the latter part of 2004 or early 2005, McMillan imposed a requirement that Stamm check in with him more frequently than he required his other NAMs to check in. By this point, however, Stamm was no longer similarly situated to the other NAMs who reported to McMillan in light of the various concerns addressed in his e-mails. *See supra* n. 8.

was hired to replace her.  Under these circumstances, Stamm cannot establish that she was replaced by someone outside of the protected class.  *See Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 519 (4th Cir. 2006) (noting plaintiff failed to establish fourth prong where undisputed evidence showed plaintiff was not replaced and duties were apparently spread out amount existing employees).

Neither are there other circumstances which would suggest discriminatory intent.  As to this alternative means of satisfying the fourth element, Stamm points to the various allegedly discriminatory events which predated her termination such as the territorial exception allowed to Thomas Cutler, the failure to provide her with a car, the lack of  support she believed she should have been given, and the fishing trip.  For reasons discussed in the Facts section of this order, none of these alleged discriminatory incidents is, in fact, indicative of discriminatory treatment.  Thus, Stamm fails to satisfy the fourth element of her *prima facie* case.

**Pretext**.  Even if Stamm could establish the elements of her *prima facie* case, she could not establish that KMBS's reasons for "terminating" her were pretext.  This is because she cannot establish that the multiple concerns which were raised as to her performance (including failure to promptly return calls and respond to e-mails, failure to file reports required by her supervisor, complaints from customers, and failure to meet quota) were not the true reasons for her termination, even if KMBS was somehow mistaken in its conclusion that Stamm was failing to meet KMBS's reasonable expectations.  At most, Stamm has pointed to some evidence that KMBS might have made different decisions or taken a different approach to dealing with Stamm's perceived deficiencies.  She has produced no evidence which would cast doubt on the conclusion that KMBS did, in fact, perceive Stamm to be deficient.

For all of the reasons set forth above, the court concludes that Stamm has failed to proffer evidence sufficient to establish a *prima facie* case of discrimination (either due to age or gender).

She has, likewise, failed to proffer evidence sufficient to cast doubt on KMBS's proffered non-discriminatory reason for Stamm's termination. For both reasons, the court grants KMBS's motion for summary judgment as to this claim.

### CONCLUSION

For the reasons set forth above, the court grants Defendant's motion for summary judgment in full. The Clerk of Court is directed to enter judgment in Defendant's favor.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
November 24, 2008